**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**JUSTIN SHIPP; VINCENT TATE; and**
**TERRENCE YAZEL, individually and**
**on behalf of all others similarly situated**                **PLAINTIFFS**

**V.**                        **CASE NO. 5:23-CV-5215**

**CENTRAL STATES MANUFACTURING, INC.;**
**CENTRAL STATES MANUFACTURING, INC.**
**BOARD OF DIRECTORS;**
**GREATBANC TRUST CO.; JAMES SLIKER;**
**CHAD WARE; THOMAS FERREE;**
**MATT KRAMER; TINA CHANG;**
**and MATTHEW STITES**                        **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendants' Joint Motion for Summary Judgment (Doc. 118).[1] This case concerns alleged mismanagement of an employee stock ownership plan governed by the Employee Retirement Income Security Act ("ERISA"). Plaintiffs are three former senior employees of Central States Manufacturing, Inc., who believe the company, its board of directors and officers, and the plan's trustee, GreatBanc Trust Co., breached fiduciary duties owed to the plan's employee-participants by engaging in certain financially imprudent transactions. For the reasons stated herein, the Court finds no genuine, material dispute as to the existence of any ERISA violations, and therefore the Joint Motion for Summary Judgment is **GRANTED**.

---

[1] The Court has also considered the following filings: Defendants' Brief in Support (Doc. 119) and Statement of Facts (Doc. 120); Plaintiffs' Response in Opposition (Doc. 132), Response to Statement of Facts and Additional Facts (Doc. 133), and Exhibits (Doc. 134); and Defendants' Reply (Doc. 140), Response to Plaintiffs' Additional Facts (Doc. 145), and  Exhibits (Doc. 146). Where briefs and exhibits were redacted on the public docket, the Court also reviewed the unredacted versions of those same documents filed under seal.

1

## I.   BACKGROUND

The following facts are undisputed. Central States Manufacturing, Inc. is a metal roofing and siding company headquartered in Tontitown, Arkansas. In 1991, the company implemented an employee stock ownership plan ("ESOP") to transition to full employee ownership. The ESOP acquired all outstanding shares using loan proceeds, with the shares held in trust and gradually allocated to employees' individual accounts as retirement benefits.

Over the next decade, Central States continued to expand, establishing manufacturing and retail locations across the eastern United States. In 2011, Central States's Board of Directors established an ESOP Trust to own and manage all ESOP shares and appointed Separate Defendant GreatBanc Trust Co. to serve as the ESOP's independent Trustee. GreatBanc was empowered to enter into stock purchase and sale transactions on behalf of the ESOP, including "to borrow money from any lender (including the Employer or any shareholder of the Employer) to finance the acquisition of Company Stock with one or more Acquisition loans" for the purpose of purchasing Company Stock." (Doc. 121-26, p. 6, § 5.1(a)(i)). Under the Plan, Central States was the "Plan Administrator" for purposes of performing or delegating ministerial tasks. (Doc. 121-24, p. 10, § 2.13). The Plan also specifically contemplated "Leveraged Stock Acquisitions," wherein the Trustee would "borrow funds" to purchase company stock at a "reasonable rate of interest." *Id.* at p. 20, § 6.2.

Under the ESOP, employees of Central States automatically become Plan "Participants" when they join the company and remain so as long as they meet Plan requirements. Every year, the company makes stock and/or cash contributions to the

employees' ESOP accounts, and the ESOP then holds these shares in trust for the benefit of the Participants. The Plan guarantees that when Participants retire or otherwise separate from the company, Central States will purchase all of their ESOP shares at market value. As Participants retire and redeem their shares, those shares are removed from circulation, reducing the total number of outstanding shares. Holding the company's overall value constant, this reduction increases the per-share value of the remaining shares because that value is spread across fewer shares. Importantly, this redeem-and-retire process does not make *the company* more and more valuable—it just means that each remaining share represents a larger and larger slice of the same pie.

The parties agree that over time, Central States became a very profitable company. Equity value increased, which meant the value of the company's stock increased. Also over the course of years, the ESOP's allocated shares became concentrated in the accounts of senior employees who had been with the company for a long period of time. The employee with the most ESOP shares was Central States' CEO and Board president Rick Carpenter, who in 2018 unexpectedly announced his plan to retire. This sparked concerned conversations among the company's leadership, as the prospect of repurchasing his ESOP shares was certain to create a dent in Central States' overall finances. It was Mr. Carpenter's sudden retirement that prompted the Board to take a hard look at near-term ESOP repurchasing obligations. The Board tasked CFO Chad Ware with investigating the problem.[2]

---

[2] Plaintiffs have sued the Board members individually. They are: Central States's current CEO James Sliker, Chair of the Audit and Governance Committee Thomas Ferree, Board Chair Matt Kramer, Board Member Tina Chang, and Board Member Matthew Stites. Company CFO Ware is an officer but not a Board member.

It soon became clear that at the beginning of 2019, ESOP Participants aged 50 and older who were nearing retirement age collectively held approximately $115 million in company stock, *see* Doc. 121-46, p. 6; and of that total, $47.4 million was held by just twelve employees, *see* Doc. 121-6, p. 28. At the same time, the number of outstanding shares available for new or existing Participants was steadily diminishing as employees separated and retired.

With the company's long-term financial health in mind, the Board began pondering solutions to mitigate the impending repurchase obligation. Mr. Ware met with the Board on April 4, 2019, to discuss some options. Also, present were a representative from ESOP Trustee GreatBanc; a representative from the firm of Stout Risius Ross, LLC ("Stout"), which GreatBanc had hired as its independent financial advisor; and a representative from Principal Financial Group ("Principal"), which Central States had hired to model possible repurchase obligation scenarios. During the meeting, Mr. Ware announced the following "guiding principles" he and others in management had workshopped to address the near-term repurchase problem:

(1) sustain the company's long-term future including strategic growth;

(2) provide employees a "greater than market" contribution without being excessive, with annual contributions within a specified band based on company performance and all employees aligned on driving share price through business performance;

(3) substantially correlate share price evolution to business performance or equity value of the company;

(4) be fair to terminated employees but prioritize current employees relative to on-going benefits; and

(5) distribute funds to terminated employees as fast as possible.

4

(Doc. 123-58, p. 3). These principles were intended as the lens through which the company and its advisors would evaluate the potential strategies and foster discussions for how best to manage the company. *See* Doc. 121-2, p. 21 (Dep. of James Silker, Central States's CEO).

Over the next several months, the group evaluated the pros and cons of various proposals, including "releveraging" and "recycling" stock shares. "Releveraging" would involve Central States buying a large number of shares from retiring Participants at market value and then selling those shares back to the ESOP in exchange for a promissory note. Then, the newly purchased shares would be held in a suspense account owned by the ESOP and released to Participants over a long period of time as the promissory note was gradually paid off. Releveraging could allow the company to maintain the same number of shares outstanding while distributing them over time, rather than all at once. By contrast, "recycling" would involve the ESOP buying a block of shares from retiring Participants using cash provided by Central States and immediately allocating those shares to the remaining ESOP Participant accounts. Of course, both releveraging and recycling had their pros and cons, and the group considered other possible solutions, including Central States matching stock shares with equal 401(k) contributions, adjusting the company's stock contribution rates, or adjusting the stock distribution parameters. *See* Doc. 123-58, p. 3 (notes from April 4, 2019 meeting).

Central States asked its financial advisor, Principal, to analyze the various scenarios and then report back to the group. Principal did so and shared its draft with Mr. Ware, who then forwarded it to the Board. *See* Docs. 121-62 & 121-63. After that, on July 1, 2019, Mr. Ware met with GreatBanc's and Stout's representatives to discuss the

scenarios that Principal had prepared for the next day's meeting. *See* Doc. 121-61.[3] On July 2, Mr. Ware, the Board, and representatives from GreatBanc met again to discuss Principal's and Stout's five economic models. *See* Doc. 121-65. At the end of the meeting, Mr. Ware emailed Principal to request that it model two more scenarios, and Principal circulated those slides, including to GreatBanc, on July 11. *See* Doc. 121-69. The Board met on July 17 to discuss all of these scenarios and asked for two more, bringing the total to nine. *See* Doc. 121-71. Principal once again supplied the new models. *See* Doc. 121-72.

On August 27, 2019, Mr. Ware emailed GreatBanc's representatives "to discuss . . . [Central States's] options and [GreatBanc's] thoughts on the scenarios discussed in our repurchase obligation study and the timeline later this year for a potential releverage situation similar to scenario #8 in our study[.]" *See* Doc. 121-77. Mr. Ware asked GreatBanc whether, in its capacity as ESOP Trustee, it was "in agreement" with the releveraging scenario the Board was considering or "want[ed] to discuss other scenarios," as "[t]he executive team w[ould] be offering [their] final recommendation to the board in September and want[ed] [GreatBanc's] buy off before presenting [their] recommendation." *Id.* Mr. Ware also emailed GreatBanc on September 3 with more questions to consider. *See* Doc. 121-79.

On September 9, 2019, Mr. Ware requested that Principal and Stout each model "one more scenario" that was "a blend" of two scenarios previously modeled (for a total

---

[3] Stout's managing director emailed Principal's representative to explain that Stout—on behalf of GreatBanc and the "trustee team"—had conducted its own independent modeling of the various scenarios and would share that data with Principal and Mr. Ware before the July 1, 2019 call. *See* Doc. 121-61.

of *ten* modeled scenarios). (Doc. 121-147). Finally, on September 18 and 19, the Board met and approved a two-step releveraging transaction to take place in December 2019. Before they adjourned, however, the Board decided to seek a second opinion of Principal's work. *See* Doc. 121-89. Central States hired a company called Chartwell Financial Advisory, Inc. to model three releveraging transactions for discussion. Chartwell provided its draft opinion in November 2019, which included updated financial estimates as well as comparisons to the models that Principal had prepared. Chartwell followed up with a final report on January 16, 2020. *See* Doc. 121-106. According to Chartwell, if the "status quo" practice of redeeming and retiring shares were simply maintained, by fiscal year 2026 the value of "equity related capital claims" by retiring ESOP Participants would "exceed[ ] 100% of annual [Free Cash Flow]." *Id.* at p. 14. Chartwell's opinion was that the company should abandon the status quo and instead select a stock releveraging alternative that would "significantly improve[ ]" Central States's "balance sheet liquidity." *Id.* at p. 15.

A week later, on January 23, 2020, Mr. Ware emailed Chartwell's final report to two GreatBanc representatives and to attorney Danny Johnson, Central States's ERISA counsel. *See* Doc. 121-110. The Board met on January 31 to discuss the various options and approved the following two-step releveraging transaction:

> **TRANSACTION ONE**: Central States would purchase a block of approximately 2.2 million shares from Participants who were either retired/separated from the company or nearing retirement and, after paying those Participants, remove their shares from circulation.

> **TRANSACTION TWO**: The ESOP would repurchase those same 2.2 million shares from Central States in exchange for a 30-year, $40 million promissory note; the ESOP would then hold the shares in a "suspense account" to be allocated to active Participants little by little over time, as the promissory note was paid down.

7

*See* Doc. 121-9 (January 31, 2020, Board Meeting Minutes). Mr. Ware began planning the transaction dates but paused when the COVID-19 Pandemic hit in March 2020, and Central States, like so many other businesses, experienced financial uncertainty as lockdown measures proliferated across the country.

It was not until August 2020 that GreatBanc re-engaged Stout to conduct a new per-share valuation of Central States, since the last valuation was performed in December 2019 and Central States's equity value had increased since then. Stout revalued the stock at between $16.50 and $19.80 per share, up from the $14.97 per-share valuation from year-end 2019. *See* Doc. 121-125. GreatBanc's internal committee then met with Stout to go over the new valuation. GreatBanc recommended that its representatives negotiate with Central States on behalf of  ESOP Participants to secure a price per-share in the higher range that Stout had calculated; this higher price would be more favorable to those ESOP Participants planning to sell their shares in Transaction One. *See* Doc. 121-126.

GreatBanc ultimately requested a price of $18.00 per share, in the middle of Stout's recommended range—and $3.00 more than the 2019 stock valuation. Central States agreed to the price, *see* Doc. 121-134, and on August 31, 2020, completed Transaction One by purchasing 2,222,222.22 shares for $18.00 per share, *see* Doc. 135 (Redemption Agreement). Central States disclosed the details of Transaction One to its employee-shareholders in an email dated August 29, 2020, calling it "the strategy to mitigate the repurchase obligation risk." (Doc. 121-136).

Transaction Two required the ESOP to buy back the 2.2 million shares from Central States and place the shares in a suspense account. This transaction did not occur immediately, and in the meantime, the per-share value of the company increased again.

GreatBanc re-engaged Stout to evaluate the fair market value of the shares to ensure the ESOP did not pay too much in the buyback transaction. In November 2020, Stout's share price estimate was between $19.95 and $24.50 per share. *See* Doc. 121-143. GreatBanc decided to once again request $18.00 per share, though that price was below fair market value—but a good deal for the ESOP. *See id.* Central States agreed to the price, and Transaction Two closed on December 2, 2020. The ESOP issued Central States a promissory note (Doc. 121-146) in the amount of $40 million, to be repaid over the next three decades as the ESOP released the shares over time to new or existing Participants.

Plaintiffs had large ESOP balances in their accounts when Transaction Two took place in December 2020. Plaintiff Justin Shipp was employed by Central States from 2008 to 2019 and served as IT Manager. *See* Doc. 98 (Shipp Decl.). Plaintiff Vincent Tate joined Central States in 2009 and served as CFO of the company until 2018, when the Board "lost confidence and trust in [him]" and replaced him with Mr. Ware; Mr. Tate announced his retirement in 2022. (Doc. 110-4, p. 29 (Tate Dep.)). Plaintiff Terrence Yazel began working for Central States in 2012 and became a Managing Director; he ended his employment with the company in 2018 but chose to wait until he reached age 62 to receive his full retirement distribution. *See* Doc. 121-38, p. 5 (Yazel Dep.).

Importantly, none of the Plaintiffs criticize Transaction One because they agree the ESOP suffered no injuries when Central States purchased 2.2 million shares at market value; in fact, this transaction *decreased* the number of outstanding shares in the ESOP and *concentrated* the stock value in Plaintiffs' ESOP accounts. At the same time, though, it is also undisputed that if the company had stopped at Transaction One and not completed Transaction Two, the near-term repurchase problem the company identified

back in 2018 would not have been addressed and would, in fact, have worsened. Nevertheless, Plaintiffs argue that Transaction Two was financially imprudent, caused them injury, and violated Defendants' fiduciary duties under ERISA.

According to Plaintiffs, the value of their existing shares was diluted when 2.2 million shares reentered the ESOP during Transaction Two and were placed in a suspense account. Plaintiffs reason that, as a result of Transaction Two, the equity value of the company was spread among 2.2 million *more* shares, which meant their existing ESOP accounts now held a proportionally smaller slice of the company pie. They argue that Transaction Two was unnecessary, as there is little evidence that the near-term repurchasing obligation posed a true threat to the company's financial health. Plaintiffs suggest that Central States could have dealt with the near-term repurchasing obligation through increased profitability—which the company was already experiencing. They claim there is no evidence to prove Central States, the Board, or GreatBanc "seriously considered" "alternative strategies that would avoid or minimize Participant harm," such as: (1) maintaining the status quo by not engaging in Transaction Two; (2) taking on future corporate debt as needed; (3) boosting the value of all Participant shares after Transaction Two by approximately $4.36 per share (to compensate for the "dilution effect"); or (4) selling the company. (Doc. 135, pp. 29 (citing Plaintiffs' Expert Report, Doc. 121-44, pp. 43–46), 32).

GreatBanc and Central States respond that they were always aware of the fact that releveraging would impact the per-share value of Participants' company stock for at least some period of time. However, they observe—and Plaintiffs agree—that ERISA does not prohibit releveraging transactions, *per se*, and the Plan permitted GreatBanc to

take on debt to purchase stock. Further, Plaintiffs agree that no ESOP Participant lost shares as a result of the 2020 releveraging transaction, and no Defendant received additional or different compensation as a result of the transaction. Plaintiffs nevertheless accuse Central States, Mr. Ware, the Board, and GreatBanc of violating their fiduciary duties to the Plan Participants as a result of Transaction Two. Under 29 U.S.C. § 1104(a)(1)(A)–(B), an ERISA fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and to do so:

> (A)   for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

Part "A" cited above is generally referred to as ERISA's "duty of loyalty" and part "B" is referred to as the "duty of prudence." *See Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014). Plaintiffs also allege that Central States and its Board violated § 1106(b)(1) of ERISA by charging the ESOP too much for the releveraged stock and causing the ESOP to incur unnecessary debt in the form of a promissory note.

The Joint Motion for Summary Judgment argues that Plaintiffs' "stock dilution" theory does not qualify as a concrete, particularized loss sufficient to confer Article III standing—but even if it did, neither Central States nor its Board acted as ERISA fiduciaries in Transaction Two but rather made exclusively corporate decisions for the benefit of the company. Further, the allegation that Central States violated ERISA by charging too much for the shares acquired in Transaction Two is demonstrably false, as Plaintiffs concede the fact that the ESOP paid below-market value for the releveraged

11

shares. As for GreatBanc's liability, Defendants agree that GreatBanc functioned as an ERISA fiduciary in Transaction Two but argue there is no genuine, material dispute over whether GreatBanc satisfied its fiduciary duties to the ESOP in that transaction. Further, Defendants argue that Central States could not have violated § 1106 of the ERISA as a matter of law because ESOP paid below-market value for the releveraged shares.

Plaintiffs respond that their dilution theory satisfies all standing requirements because their injuries are concrete and particularized. As for the merits, Plaintiffs contend that a loyal and prudent fiduciary would never have agreed to Transaction Two because it was unnecessary—as the company was doing well financially—and the dilutive effect on active Participants' shares meant the transaction was not in Participants' best interests and violated the duties of loyalty and prudence. Plaintiffs argue that Central States and its Board acted as ERISA fiduciaries by "causing" the ESOP to approve and participate in Transaction Two because Mr. Ware and the Board devised, designed, and recommended the transaction to GreatBanc—but failed to meaningfully monitor GreatBanc's evaluation of the transaction. *See* Doc. 135, pp. 21–23. In other words, Plaintiffs believe Central States left GreatBanc no option but to agree to a transaction that was clearly not in the ESOP's best interests, and GreatBanc uncritically "rubber stamp[ed] the transaction." *Id.* at p. 23.

## II.  LEGAL STANDARD

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986). Subpart (a) to Rule 56 provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In considering a motion for summary judgment, the Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998).

### III.    DISCUSSION

### A.    Standing

The Court first considers whether Plaintiffs have standing to sue for ERISA violations. To establish Article III standing, a plaintiff must demonstrate that they suffered an injury in fact and point to evidence to show a causal relationship between the injury alleged and the challenged conduct. *See Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).

Defendants argue that Plaintiffs' alleged injuries appear speculative rather than concrete and particularized. After all, Plaintiffs agree that the ESOP paid a below-market price for the shares acquired in Transaction Two in 2020, and they further agree that no Participant lost shares in the transaction, that the ESOP's ownership percentage remained the same (100%), and that the transaction had no effect on Central States's equity value. However, Plaintiffs characterize their injuries as losses precipitated by the dilution of their stock value after Transaction Two. After Transaction One but before Transaction Two, active Participants' stake in the company was spread over 2.2 million *fewer* shares than usual; but after Transaction Two, active Participants' stake in the company was spread over 2.2 million *more* shares, thus, diluting the per-share value.

Plaintiffs present no proof that they had a legal expectation of any particular per-share value, and their alleged injuries do not appear to pertain to the Plan's holdings as a whole, but rather to individual Plaintiffs' *expectations* of value if they were to have immediately cashed in their shares after Transaction Two.

The Court acknowledges that Plaintiffs' dilution theory is a novel one, and a review of the caselaw has failed to turn up a similar fact pattern. It therefore seems prudent to assume for the sake of argument that the dilution theory satisfies Article III standing and confront the merits of Plaintiffs' § 1104 claims.

### B.    Liability of the Central States Defendants

Central States, Mr. Ware, and the Board argue that no reasonable jury could find that the two-step releveraging transaction was anything but a corporate decision made with the financial health of the company in mind. As a matter of law, "normal business decisions with potential collateral effects on prospective, contingent benefits need not be made in the interest of plan participants." *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 646 (8th Cir. 2007). And nothing in ERISA "prohibit[s] an employer from acting in accordance with its interests . . . when not administering the plan." *Id.* (quoting *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir. 1986)). In other words, business decisions do not give rise to liability under ERISA's fiduciary standards. *See Beck v. PACE Int'l Union*, 551 U.S. 96, 101–02 (2007).

Plaintiffs ask the Court to take a step back and view the Central States Defendants actions in context. Plaintiffs agree with Central States that determining the best method for managing a repurchase obligation is a corporate function and that the management and design of an ESOP company's repurchase obligation is also a corporate function.

14

However, Plaintiffs appear to argue that Central States's ultimate selection of one releveraging strategy transformed Mr. Ware and the Board into "functional fiduciaries" who "*caus[ed]* the ESOP to acquire shares, incur, debt, and place shares in suspense." (Doc. 135, p. 21) (emphasis added). Unfortunately for Plaintiffs, this strained argument is unsupported by the facts.

It is undisputed that the company's near-term repurchasing problem first came to the Board's attention in 2018, when Central States's CEO suddenly announced his retirement and the company's obligation to repurchase his ESOP shares demanded fiscal planning. Plaintiffs agree that Mr. Ware investigated the company's concerns about other near-term repurchasing obligations and presented his findings to the Board. Then, over the next several months, at least ten scenarios were workshopped by Mr. Ware, the members of the Board, and GreatBanc. Central States hired an independent advisor to model the scenarios, and GreatBanc hired its own financial advisor to look at the models and weigh in. After that, Central States hired yet another independent advisor to double-check the data and provide a second opinion, and those results were shared with the group, including GreatBanc. Once the Board selected a strategy, there is no dispute that it had been thoroughly vetted, including by multiple independent financial advisors.

With respect to GreatBanc's due diligence, there is no dispute that several months after the particulars of the releveraging transaction were selected by Central States, GreatBanc re-engaged its financial advisor to provide updated stock valuations for the benefit of the ESOP Participants, the result being that Transaction One utilized a stock price of $18.00 per share—in the middle of Stout's updated range. It is further undisputed that GreatBanc had its advisor reevaluate the stock price again—for the ESOP's benefit—

15

immediately before Transaction Two, and GreatBanc's diligence resulted in Central States accepting a below-market stock price. Given these facts, Plaintiff's allegation that Central States put on a "functional fiduciary" hat to dupe GreatBanc is entirely unsupported, and their insinuation that GreatBanc merely "rubber stamp[ed]" the transaction is borderline frivolous.

The Court assumes on summary judgment that Central States's business decision resulted in a temporary reduction in the ESOP's per-share stock value. Even so, that does not mean that the Central States Defendants functioned as ERISA fiduciaries. "Virtually *all* of an employer's significant business decisions affect the value of its stock, and therefore the benefits that ESOP plan participants will ultimately receive." *Martin v. Feilen*, 965 F.2d 660, 666 (8th Cir. 1992) (emphasis added). Therefore, business decisions are not considered plan fiduciary decisions simply because they impact the plan in some respect. "ERISA's fiduciary duties [of loyalty and prudence] under § 1104 attach only to transactions that involve investing the ESOP's assets or administering the plan"—which are not implicated with respect to Central States. *Id.*

A business decision carries with it pros and cons, but here, Plaintiffs focus only on the cons—and only those personal to them. They ignore that Transaction Two benefited the Plan by *replenishing* the ESOP with 2.2 million more shares to distribute to active and future Participants over the next three decades. Plaintiffs—all terminated or retired employees with large ESOP accounts—think less about the Plan than about their individual stock portfolios. This is clear from their observation that the releveraging transaction was not warranted in 2020 because the economic modeling showed that Central States's "debt capacity would far exceed its debt" *through 2028*. (Doc. 135, p. 14).

16

In other words, Plaintiffs suggest that releveraging may be appropriate in 2028, once their shares have long been redeemed and the company faces a possible debt-to-profit crisis, but they object to releveraging *now*.

The Court concludes there is no genuine, material dispute that the Central States Defendants were not functioning as ERISA fiduciaries in the releveraging transaction under § 1104—except with respect to their administrative duty to monitor the Plan Trustee, GreatBanc. Plaintiffs accuse GreatBanc of breaching its duties of loyalty and prudence to the Plan. If such claims are dismissed, the duty-to-monitor claim against Central States must also be dismissed. *See Allen v. Wells Fargo & Co.*, 967 F.3d 767, 777 (8th Cir. 2020) (finding appropriate the dismissal of co-fiduciary liability and duty-to-monitor claims when underlying duty-of-loyalty claim was without merit).

As for Plaintiffs' final claim against Central States under § 1106(b), they allege Central States "deal[t] with the assets of the plan in [its] own interest" or engaged in a transaction "involving the plan on behalf of a party whose interests are adverse to the interests of the plan." *Id.* § 1106(b)(1)–(2).  However, as explained above, there is no evidence that Central States was acting as a Plan fiduciary by investigating, approving, and consummating the two-part releveraging transaction. Moreover, even if Central States were acting in such a capacity, the ERISA statute at § 1108(e) provides that a § 1106 claim is unavailable if the employer sells securities to a plan "for adequate consideration"—defined at § 1002(18) as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary." As it is undisputed that the ESOP purchased shares in Transaction Two *below* fair market value, Plaintiffs have suffered no injury under § 1106(b), and the claim is without merit.

## C.    Liability of GreatBanc

As ESOP Trustee, GreatBanc was required to maintain duties of loyalty and prudence to the Participants. Plaintiffs assert that GreatBanc breached these duties by approving Transaction Two. According to Plaintiffs, there is no amount of due diligence GreatBanc could have done to avoid breaching its duties of loyalty and prudence to the Plan because it acquiesced—without enough of a fight—to Central States's business decision to add shares to the ESOP through a releveraging transaction. GreatBanc's extensive, months' long evaluative process of examining the releveraging transaction did not satisfy its ERISA duties because Plaintiffs have determined "the status quo would [have] better serve[d] Participants' interests." (Doc. 135, p. 31).

Plaintiffs agree that the Trust Agreement conferred upon GreatBanc "in its sole discretion, the authority and responsibility to invest and hold the assets of the Trust primarily in Company Stock for the exclusive benefit of Participants and their Beneficiaries." (Doc. 121-26, p. 6 , § 5.1(a)(i)). "To that end" GreatBanc was given:

> (A) full and complete investment authority and responsibility with respect to the purchase, retention, sale and pledge of Company Stock; and (B) complete authority to contract or otherwise enter into transactions for the purpose of acquiring or selling Company Stock, including transactions with the Employer or any shareholders of the Employer, and to borrow money from any lender (including the Employer or any shareholder of the Employer) to finance the acquisition of Company Stock with one or more Acquisition Loans[.]

*Id.*

Given the explicit authority vested in GreatBanc by the Plan and the lack of facts to show collusion between GreatBanc and Central States, self-dealing by GreatBanc, or lack of transparency, the claim that GreatBanc breached its fiduciary duties to the Plan is without merit. First, even if Central States *could have* stuck with the status quo, as

18

Plaintiffs would have preferred, there is no dispute that the *purpose* of releveraging was to prevent Central States from incurring future corporate indebtedness caused by near-term repurchasing obligations. Second, it is undisputed that both Principal's and Chartwell's financial models showed that a releveraging transaction was more effective than the status quo by: (1) *reducing* the cost of these near-term repurchase obligations, which were expected to top $115 million; (2) *increasing* the number of ESOP shares available as a retirement benefit to employees; and (3) *reducing* projected debt levels for the company.

There is no evidence that GreatBanc breached its duty of loyalty to the Participants in evaluating the releveraging transaction at each step. Plaintiffs acknowledge that GreatBanc retained Stout to provide independent financial advice, and Stout considered, among other things, Central States's audited financial statements, financial projections, transaction documents, and financial data on comparable public companies. Stout also had discussions with certain members of Central States and GreatBanc regarding the operations, financial condition, future prospects, and projected performance of the Company. Furthermore, Plaintiffs do not dispute that GreatBanc benefited Participants in securing a middle-of-the-range share price for Transaction One and a below-market share price for Transaction Two. The Trustee's duty of loyalty is not to individual Plan Participants but to *all* Plan Participants or the Plan as a whole, and here, there are no facts to support a breach of the duty of loyalty.

Next, the duty-of prudence claim focuses on "the process by which [the fiduciary] makes its decisions rather than the results of those decisions." *Braden*, 588 F3d at 595. In assessing the relevant facts, "courts must give due regard to the range of reasonable

19

judgments a fiduciary may make based on [its] experience and expertise." *Hughes v. Northwestern Univ.*, 595 U.S. 170, 177 (2022). With that in mind, there is no genuine, material dispute that GreatBanc's decision-making process was objectively reasonable and prudent. In 2019 and 2020, the Board and management met and communicated multiple times with GreatBanc, Stout, Principal, and Chartwell to model financial strategies, analyze company financial health, and consider ESOP stock prices. Plaintiffs do not challenge the accuracy of *any* of the financial information that Central States provided to Principal and Chartwell that served as the building blocks for the various financial scenarios. Further, it is undisputed that Stout—GreatBanc's advisor—was given Principal's and Chartwell's modeling, performed its own modeling, and was re-engaged *twice* in 2020 by GreatBanc to provide updated stock valuations. Plaintiffs' disagreement with GreatBanc is less about the *process* than the fact that Transaction Two *happened at all*. Accordingly, the duty-of-prudence claim is dismissed on summary judgment.

As no claims remain against GreatBanc, the duty-to-monitor claim against Central States Defendants is also dismissed.

## IV.    CONCLUSION

**IT IS ORDERED** that Defendants' Joint Motion for Summary Judgment (Doc. 118) is **GRANTED**. The Amended Complaint is **DISMISSED WITH PREJUDICE,** and all other pending motions are **MOOT**. A judgment will enter separately.

**IT IS SO ORDERED** on this 30th day of March, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE

20